**UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS
KANSAS CITY-LEAVENWORTH DIVISION**

| | | |
|---|---|---|
| LEAMAN CREWS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| KATHLEEN HAWK SAWYER, in her official | ) | |
| capacity as the Director of the Bureau of | ) | |
| Prisons, and Dr. DEBORAH G. SCHULT, in | ) | |
| her official capacity as Assistant Director for | ) | |
| the Health Services Division of the Federal | ) | |
| Bureau of Prisons, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### INTRODUCTION

Plaintiff Lawrence Crews has a deadly medical condition for which he receives FDA-approved and doctor-prescribed medication that keeps him alive. On September 4, 2019, he reported to the United States Penitentiary at Leavenworth, a federal Bureau of Prisons (BOP) facility, to begin a 36-month sentence. But unless this Court intervenes, BOP officials will halt Mr. Crews' life-saving medication within the next week. That is because his condition is opioid use disorder, his medication is buprenorphine, and BOP's policy categorically denies all non-pregnant inmates access to buprenorphine as a treatment for opioid use disorder. This policy, as applied to Crews, likely violates the Eighth Amendment, as well as multiple federal statutes. This Court should grant a preliminary injunction requiring the BOP to provide Mr. Crews his medically necessary treatment.

America is in the midst of a public health crisis caused by opioid addiction. To confront this crisis, multiple federal agencies have embraced the medical consensus that the standard of care to treat opioid use disorder is medication for addiction treatment, or MAT, which incorporates FDA-approved medications like buprenorphine or methadone. The medical consensus does not change in the correctional environment. U.S. Attorney's Offices have even initiated investigations against state and local correctional institutions that withhold MAT from inmates. Yet the BOP remains an outlier. Although it prescribes methadone to treat inmates for pain and to treat pregnant inmates for opioid use disorder, BOP expressly prohibits buprenorphine as treatment for opioid use disorder for all non-pregnant inmates.

The BOP's policy imminently threatens Crews' ongoing recovery and his physical and mental health. Like many Americans, Crews first took opioids for debilitating pain after a serious car accident. Over time, he became utterly dependent on them. With the help of his doctor-prescribed buprenorphine treatment, Crews has escaped more than a decade of active addiction and entered long-term recovery. A rare success in the public health crisis, Crews has been clean for 15 months with the help of MAT. Crews made a grave mistake using his position of employment to gain access to money he used to buy opioids. He has accepted responsibility for his actions, pled guilty, made substantial restitution payments every month, and worked through therapy to make amends to others in his life whom he harmed. His mistake was serious but should not claim his life.

Absent an injunction, the BOP's policy will cause Crews to suffer painful withdrawal and will place him at a high risk of relapse, overdose, and death.  Accordingly, Crews seeks emergency injunctive relief to require the BOP to provide him with continued access to his medically necessary, physician-prescribed medication to treat his opioid use disorder. Because

Crews self-surrendered to a BOP facility on September 4, 2019, and because under BOP's written policy persons entering custody on MAT may be given as little as three days before their medication is withdrawn altogether, his medication may be discontinued as soon as September 7, 2019.

The relief Crews seeks is not without precedent. BOP settled a case in June, agreeing to provide methadone-based MAT to an inmate about to serve a 366-day sentence, who—like Crews—had successfully overcome long-term opioid use with the use of MAT. *See DiPierro v. Hurwitz*, No. 1:19-cv-10495 (filed March 15, 2019) (Settlement agreement attached as Exhibit 1). In addition, in November 2018, a district court granted a preliminary injunction requiring a Massachusetts county facility to provide an inmate with continued access to methadone, despite a similar policy banning such treatment, because denying methadone likely violated both the Eighth Amendment and the Americans with Disabilities Act (ADA). *See Pesce v. Coppinger*, No. 18-cv-11972-DJC, 2018 WL 6171881 (D. Mass. Nov. 26, 2018). And just in April, the First Circuit Court of Appeals upheld a preliminary injunction against a county jail in Maine that refused to provide buprenorphine-based MAT for an inmate with diagnosed opioid use disorder. *See Smith v. Aroostook Cty.*, 922 F.3d 41 (1st Cir. 2019) (per curiam) (affirming preliminary injunction); *Smith v. Aroostook Cty.*, 376 F. Supp. 3d 146 (D. Maine 2019) (granting preliminary injunction).

The Court should reach a similar conclusion here, as the BOP's policy likely violates the Eighth Amendment, the Rehabilitation Act, and the Administrative Procedures Act (APA). Because the other equitable factors also favor relief, this Court should issue an order requiring Defendants to provide Crews continued access to buprenorphine while he is in custody.

## FACTS

### A.    Opioid Use Disorder Is a Serious Medical Issue and a Public Health Crisis.

Opioid use disorder ("OUD") is a chronic brain disease.[1] OUD symptoms include cravings, withdrawal symptoms, and a loss of control.[2]  Without treatment, people with OUD often cannot control their use of opioids. Like many other chronic diseases, genetic factors account for much of a person's vulnerability to addiction.[3] Other risk factors include early exposure and childhood trauma.[4] More than half a million people in America have died from opioids in the last 20 years.[5] Every day, more than 115 Americans die after overdosing on opioids.[6] OUD is especially dangerous for people who are or have been incarcerated.[7]

### B.    MAT Is the Standard of Care for Treating Opioid Use Disorder.

The standard of care for treating OUD is known as medication for addiction treatment or medication-assisted treatment (MAT), which combines medication and counseling.[8] The three FDA-approved medications for treating this disease are methadone, buprenorphine (Suboxone), and naltrexone (Vivitrol). Not every medication works equally well for each patient, and if one form of MAT is working for a patient, it is against the standard of care to involuntarily terminate it.[9]  MAT's effectiveness is well documented and has been shown to decrease opioid use and

---

[1] Declaration of Laurel Witt, MD ("Witt Decl."), ¶ 5.
[2] *Id.* ¶ 9.
[3] *Id.* ¶ 6.
[4] *Id.*
[5] Centers for Disease Control and Prevention, Opioid Overdose: Understanding the Epidemic, *available at* https://www.cdc.gov/drugoverdose/epidemic/index.html (last updated August 20, 2017) ("CDC, Opioid Overdose").
[6] Ashley Welch, Drug overdoses killed more Americans last year than the Vietnam War, CBS NEWS, Oct. 17, 2017, *available at* https://www.cbsnews.com/news/opioids-drug-overdose-killed-more-americans-last-year-than- the-vietnam-war/.
[7] Declaration of Ross MacDonald, MD ("MacDonald Decl."), ¶ 26.
[8] Witt Decl. ¶ 11.
[9] *Id.* ¶ 15.

decrease opioid overdose mortality rates.[10] For example, the World Health Organization (WHO) deems buprenorphine and methadone "essential medicines" for treating OUD.[11] Meanwhile, the FDA has declared "[i]mproving access to prevention, treatment and recovery services, including the full range of MAT, is a focus of FDA's ongoing work to reduce the scope of the opioid crisis."[12] The President's Office of National Drug Control Policy (ONDCP) recently promised the "Administration will work across the Federal government to remove barriers to substance use disorder treatments, including those that limit access to any forms of FDA-approved MAT[.]"[13] ONDCP also promised in particular to "increase[e] the availability of MAT for incarcerated individuals."[14] And the Substance Abuse and Mental Health Services Administration (SAMHSA) offers billions of dollars in federal grants to increase MAT programs and support.[15]

## C.    Buprenorphine Is Medically Necessary for Crews.

Crews suffers from OUD and essential (primary) hypertension.[16] He has also been diagnosed with generalized anxiety disorder and bipolar disease.[17] Crews began using opioids in 2004, after a serious car accident left him with intense back pain. His use soon snowballed into years of active addiction. Although Crews tried to quit several times, he was never able to do

---

[10] *Id.* ¶ 11.

[11] National Institute on Drug Abuse, Effective Treatments for Opioid Addiction, available at https://www.drugabuse.gov/publications/effective-treatments-opioid-addiction/effective-treatments-opioid-addiction (last updated Nov. 2016) ("NIDA, Effective Treatments").

[12] FDA News Release, FDA approves first generic versions of Suboxone® sublingual film, which may increase access to treatment for opioid dependence (June 14, 2018), available at https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm610807.htm ("FDA News Release").

[13] *National Drug Control Strategy*, OFFICE OF NATIONAL DRUG CONTROL POLICY (2019), at 10, *available at* https://www.whitehouse.gov/wp-content/uploads/2019/01/NDCS-Final.pdf

[14] *Id.* at 9.

[15] *See, e.g.,* SAMHSA, State Targeted Response to the Opioid Crisis Grants (June 14, 2018), *available at* https://www.samhsa.gov/grants/grant-announcements/ti-18-015.

[16] MacDonald Decl. ¶ 40.

[17] MacDonal Decl., Exhibit 13, at 49.

so.[18] As is well understood by medical practitioners, detoxification is not treatment.[19] Not surprisingly, quitting opioids did not prevent Crews from experiencing overwhelming cravings that led him to relapse.[20]

Crews finally achieved active recovery in June 2018.[21] After he had been fired from his job for abusing his position of employment to gain access to money he used to buy more and more opioids, he was reported to law enforcement and charged with crimes. Fortunately for him, the court referred him to a DEA-licensed prescriber for medication-assisted treatment. Beginning in June 2018, he was prescribed a medically appropriate dose of Suboxone (buprenorphine-naloxone) and provided counseling and group therapy.[22] Suboxone is administered as an orally disintegrating film, which is placed sublingually—under the tongue—and dissolves in the mouth.[23] Crews takes 2 films per day. Under treatment with Suboxone, Crews has now been in active recovery for more than 14 months. Repeated drug screens show that he has been clean and free of opioids throughout that entire period of time.[24] This is particularly remarkable given how long Crews was actively addicted—close to 15 years—and his co-morbid anxiety and bipolar disorder. In addition to Crews' treating physicians who have prescribed buprenorphine-based MAT for him, two other physicians who are experts in opioid use disorder have reviewed his records and concluded that continued treatment with an opioid agonist is medically necessary to treat Crews' OUD.[25]

---

[18] Declaration of Amy Crews ("A. Crews Decl."), ¶ 4.
[19] Witt Decl. ¶ 9.
[20] *Id.*; Declaration of Amy Crews ("A. Crews Decl."), ¶ 4.
[21] A. Crews Decl. ¶¶ 5-6; MacDonald Decl. ¶ 40.
[22] MacDonald Decl. ¶ 39.
[23] Witt Decl. ¶ 17.
[24] MacDonald Decl. ¶ 40.
[25] MacDonald Decl. ¶¶ 41-42; Witt Decl. ¶ 20.

Since entering active recovery, Crews has rebuilt relationships with his family and made monthly, meaningfully large restitution payments to his former employer ($14,400 in the eight months between November 2018 and July 2019). Crews, who has been married for 17 years, wishes to remain in recovery for himself and his wife. As explained below, Defendants' policies jeopardize Crews' health and recovery.

### D.    Absent Judicial Intervention, the BOP Will Contravene the Standard of Care and Imminently Terminate Crews' Buprenorphine Treatment.

Crews made serious errors of judgment while actively addicted to opioids. He committed wire fraud, using his position of employment to gain access to money he used to purchase opioids. He has accepted responsibility for his errors and pled guilty to the sole crime he was charged with. He was sentenced to a term of 36 months. On or about August 19, 2019, he received his assignment at USP Leavenworth and instructions to self-surrender on September 4, 2019. Although BOP permits the use of methadone for pain management, as a matter of policy and practice the BOP does not provide buprenorphine to inmates who suffer from OUD, even those who have been successfully prescribed these medications before their incarceration and are in active recovery.[26] The BOP's Pharmacy Services Program Statement and National Formulary, which apply to and bind all BOP institutions, mandate that "inmates will not be maintained on methadone with the exception of pregnant inmates," and that buprenorphine will "NOT" be approved for "maintenance therapy."[27] There are no exceptions to this policy.

---

[26] Exhibit 1, U.S. Bureau of Prisons Program Statement 6360.01 ("Pharmacy Services"), at 37, *available at* https://www.bop.gov/policy/progstat/6360_001.pdf; Exhibit 2, Federal Bureau of Prisons Health Services National Formulary Part I (2018), at 15, *available at* https://www.bop.gov/resources/pdfs/national_formulary-part_I-2018.pdf.
[27] *Id.*

Under BOP's detoxification procedure, Crews has begun—or will *very* imminently be—tapered off of buprenorphine, within a matter of a days at the longest. Tapering is done either over three or ten days.[28] Both of these protocols trigger excruciating withdrawal symptoms, including intense physical discomfort and psychological distress, which can lead to life-threatening complications.[29] Management of withdrawal does not itself constitute effective treatment of OUD. Crews will also be at risk of relapsing into opioid use—either during or immediately following his incarceration—increasing the chance that he will overdose and die.[30] Involuntary halting methadone treatment is particularly risky for Crews, because he has essential hypertension and because doing so could trigger generalized anxiety disorder symptoms and bipolar disorder symptoms, which include severe depression, and raise a significant risk of self-harm and suicide.[31]

Crews raised his serious medical need for buprenorphine-based MAT with his pretrial services officer and the probation officer assigned to do his presentencing investigation report, but was told that MAT would likely not be available. After Crews received a facility assignment, his counsel sent a letter to the Office of the Warden of the United States Penitentiary at Leavenworth, informing the facility of his serious medical need and requesting clarification on how BOP's MAT policy would be applied to him. No response was received. On September 4, 2019, Crews' counsel spoke with BOP counsel, who stated that Crews would be given an individualized assessment of his general medical needs and would be given treatment of some kind. BOP counsel also stated that Suboxone (buprenorphine-naloxone) is not available and did

---

[28] MacDonald Decl., Exhibit 4, at 16 (Federal Bureau of Prisons Clinical Guidance regarding Detoxification of Chemically Dependant Inmates).
[29] MacDonald Decl. ¶¶ 22-23.
[30] MacDonald Decl. ¶¶ 21-23; Witt Decl. ¶¶ 13-14.
[31] *See* MacDonald Decl. ¶ 22.

not suggest that Defendants could or would deviate from their mandatory blanket prohibition of buprenorphine maintenance treatment for opioid use disorder.

### E.      Providing Medication for Addiction Treatment to Inmates with Opioid Use Disorder Has Had Demonstrable Success.

The BOP's refusal to provide MAT to inmates stands in stark contrast to the positive results other correctional institutions have experienced by offering MAT, and the federal government's own admonishments to state and local correctional institutions which have not yet adopted this treatment regimen. Various state prisons either already administer methadone and buprenorphine to their inmates or are preparing to do so.[32]  These programs have profoundly helped inmates and their communities. For example, Rhode Island experienced large and clinically meaningful reductions in post-incarceration deaths from overdose among inmates released from incarceration after implementing a statewide MAT program.[33] In addition, the President's ONDCP recently declared that one of the Administration's priorities is "increasing the availability of MAT for incarcerated individuals."[34] The Department of Justice has also invoked the ADA to eliminate barriers to OUD recovery, and the U.S. Attorney is investigating several Massachusetts jails and prisons based on their failure to provide MAT to incarcerated people.  In so doing, the U.S. Attorney emphasized "that all individuals in treatment for OUD, regardless of whether they are inmates or detainees, are already protected by the ADA, and [] the DOC has existing obligations to accommodate this disability."[35]

---

[32] MacDonald Decl. ¶ 10.
[33] MacDonald Decl. ¶ 32.
[34] *See supra* note 13, at 9.
[35] U.S. Department of Justice Letter Dated March 16, 2018, Exhibit 3, at 2.

## **ARGUMENT**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Defense Council*, *Inc.*, 555 U.S. 7, 20 (2008); *accord Republican Party of N.M. v. King*, 741 F.3d 1089, 1092 (10th Cir. 2013). These factors also govern a motion for a temporary restraining order. *See Rangel-Lopez v. Cox*, 344 F. Supp. 3d 1285, 1289 (D. Kan. 2018) ("When addressing a motion for temporary restraining order, the court applies the same standard as it applies to a motion for preliminary injunction."); *see also Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003). "The Tenth Circuit has adopted the Second Circuit's liberal definition of the 'probability of success' requirement." *Otero Sav. & Loan Ass'n v. Fed. Reserve Bank*, 665 F.2d 275, 278 (10th Cir. 1981), quoted by *Heideman*, 348 F.3d at 1189. As such, if the moving party establishes that the harm factors tip decidedly in his favor, the probability of success requirement is "somewhat relaxed." *Heideman*, 348 F.3d at 1189 (collecting cases). In such a case, "the movant need only show questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation." Id. (internal quotation marks omitted).

Applying the preliminary-injunction test, two district courts have recently granted preliminary injunctions under the Eighth Amendment and the ADA to individuals suffering from OUD who challenged, as applied to them, their correctional facility's blanket policy denying opioid agonist maintenance treatment. *Smith*, 376 F. Supp. 3d at 162; *Pesce*, 2018 WL 6171881, at *1. All factors favor granting similar relief against the BOP's buprenorphine policy as applied to Crews, who faces immediate threat of irreparable harm.

## I.      CREWS IS LIKELY TO SUCCEED ON THE MERITS.

To obtain preliminary injunction relief, Crews need show only that he is likely to succeed on one of his claims. *See Roda Drilling Co. v. Siegal*, 2008 WL 4056229 (N.D. Okla. Aug. 11, 2008) ("Although Plaintiffs have asserted several claims against Defendant, Plaintiffs are not required to establish a likelihood of success on every one of their claims for a preliminary injunction to issue."), *preliminary injunction aff'd*, 552 F.3d 1203 (10th Cir. 2009).

Crews is likely to prove that Defendants, pursuant to BOP policy, are being, or will be within days, deliberately indifferent to his serious medical need in violation of his rights under the Eighth Amendment. Provision of buprenorphine-based MAT during the pendency of this action would "preserve the relative positions of the parties until a trial on the merits can be held." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (internal quotation marks omitted). Without emergency relief, imminent harm will result.

### A.      Crews Is Likely to Show That Defendants' Denial of Buprenorphine Treatment Constitutes Deliberate Indifference to a Serious Medical Need Violating the Eighth Amendment.

Crews is likely to succeed on his Eighth Amendment claim that halting access to his prescribed buprenorphine treatment constitutes cruel and unusual punishment. Because "society takes from prisoners the means to provide for their own needs," they "are dependent on the State for food, clothing, and necessary medical care." *Brown v. Plata*, 563 U.S. 493, 510 (2011). "Just as a prisoner may starve if not fed, he or he may suffer or die if not provided adequate medical care." *Id*. at 510–11. "A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Id.* at 511. Prison officials thus have an affirmative obligation to provide prisoners with medical care. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

An Eighth Amendment claim has objective and subjective elements. *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999). The objective element is satisfied by showing that the medical need is "sufficiently serious" to rise to the attention of the Eighth Amendment. *Id.* As relevant here, a medical need is sufficiently serious if "it is one that has been diagnosed by a physician as mandating treatment." *Id.*, quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980). The subjective element is satisfied by showing that the defendant knew an inmate faced a substantial risk of harm and disregarded that risk "by failing to take reasonable measures to abate it." *Id.*, quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Just as it protects against current harm, the Eighth Amendment also protects against future harm. *Thomas v. Bruce*, 125 F. App'x 964, 968 (10th Cir. 2005) (citing *Helling v. McKinney*, 509 U.S. 25, 33 (1993)); *accord Hunt*, 199 F.3d at 1224. Crews is likely to satisfy both elements.

> 1.    *Crews Is Likely to Satisfy the Objective Prong of His Eighth Amendment Claim.*

Crews is "reasonably likely to satisfy the objective inquiry" of the Eighth Amendment analysis. *Pesce*, 2018 WL 6171881, at *7. OUD is a serious medical need. *See Hunt*, 199 F.3d at 1224. Crews's treating physicians have prescribed buprenorphine to treat his OUD, a chronic brain disease that kills more than one hundred Americans every single day. Crews' buprenorphine is medically necessary to adequately treat his OUD. His prior attempt to quit opioid use without MAT was unsuccessful. In stark contrast, repeated urine drug screens have confirmed that he has been able to maintain sobriety with the help of MAT that includes buprenorphine-naloxone for more than a year. Physicians who have examined Crews' medical records have determined that involuntarily removing him from buprenorphine-based treatment would violate the medical standard of care.

That MAT is the standard of care to treat OUD is widely embraced by entities including the Department of Health and Human Services, the National Institute on Drug Abuse, the FDA, SAMHSA, and WHO. Once a patient is successfully recovering using burprenorphine, abruptly and involuntarily halting that medication for reasons other than medical necessity contradicts sound medical practice and prudent professional standards of care. Directly contradicting Crews' own doctor's prescribing practice and the weight of medical authority, the BOP's burprenorphine policy will categorically deny Crews access to adequate care. BOP's blanket policy prohibiting buprenorphine-based MAT preempts the constitutionally required assessment of an individual's serious medical needs. BOP officials have not claimed any authority to deviate from this ban, for which there is no written exception, and Plaintiff is unaware of any instance in which an inmate received buprenorphine maintenance treatment at a BOP facility. There can be no individualized assessment under these circumstances, because any evaluation will necessarily ignore the option of buprenorphine treatment regardless of Crews's needs. *See, e.g., Roe v. Elyea*, 631 F.3d 843, 862–63 (7th Cir. 2011) ("The failure to consider an individual inmate's condition in making treatment decisions is, as we already have concluded, precisely the kind of conduct that constitutes a substantial departure from accepted professional judgment, practice, or standards, such as to demonstrate that the person responsible actually did not base the decision on such a judgment.") (internal quotation marks and brackets omitted).

This, therefore, is not a case where "two alternative courses of treatment exist, and both alleviate negative effects within the boundaries of modern medicine." *Cf. Kosilek v. Spencer*, 774 F.3d 63, 90 (1st Cir. 2014). Here, BOP's policy does not permit *any* ongoing treatment during the term of incarceration. But even if it did, there is no reasonable alternative to buprenorphine here given that (1) Crews has had tremendous success with buprenorphine, (2) his

physician has determined buprenorphine is medically necessary to treat his OUD, (3) it would violate the standard of care to terminate this treatment, and (3) he is at high risk for dangerous withdrawal and relapse if buprenorphine is abruptly withdrawn. BOP's buprenorphine policy therefore denies Crews constitutionally adequate care for his serious medical need. *See Edmisten v. Werholtz*, 287 F. App'x 728, 733 (10th Cir. 2008) (per curiam) (reversing district court's dismissal of inmate's deliberate-indifference claim in part because, although the inmate received some medical care, "he was not given certain *prescribed* or *recommended* medical care . . . thereby suffering significant and unnecessary pain") (emphasis in original).

> 1.   *Crews Is Likely to Satisfy the Subjective Prong of His Eighth Amendment Claim.*

As applied to Crews, the BOP's buprenorphine policy constitutes deliberate indifference. "Deliberate indifference to serious medical needs is shown when prison officials have prevented an inmate from receiving recommended treatment or when an inmate is denied access to medical personnel capable of evaluating the need for treatment." *Ramos*, 639 F.2d at 575.

Here, the BOP's policy is designed to disregard Crews' medical needs in favor of a one-size-fits-all prohibition of buprenorphine maintenance treatment. Crews is thus likely to succeed on the merits of his Eighth Amendment claim because BOP's "policy ignores treatment prescriptions given to Plaintiff by his doctors." *Pesce*, 355 F. Supp. 3d at 48, quoting *Alexander v. Weiner*, 841 F. Supp. 2d 486, 493 (D. Mass. 2012) (brackets omitted). Indeed, the Defendants have been notified of Crews' serious medical need and his buprenorphine prescription—and including receiving Crews' medical records—yet they have not suggested it is even *possible* he will be able to continue his treatment.

Although prison officials might not be deliberately indifferent if they "make judgments balancing security and health concerns that are within the realm of reason and made in good

faith," *see Kosilek*, 774 F.3d at 92 (citation omitted), that is not the situation here. BOP's policies do not, and could not, identify security reasons for banning orally disintegrating Suboxone film—which, if administered properly, cannot be diverted, *see* Witt Decl. ¶ 17—much less weigh them against Crews's urgent need for continued treatment. Indeed, state jails and prisons have implemented MAT policies that allow inmates to continue buprenorphine or methadone treatment for OUD. And several institutions, including the National Commission on Correctional Health Care and the National Sheriffs' Association, have called for the provision of all three forms of MAT in jails and prisons. Thus, security concerns cannot justify denying Crews his buprenorphine treatment. *See Pesce*, 2018 WL 6171881, at *6; *see also Sealock v. Colorado*, 218 F.3d 1205 (10th Cir. 2000) (reversing summary judgment to defendant who had delayed heart attack treatment because there was "factual evidence from which a jury could conclude that the delay occasioned by his inaction unnecessarily prolonged appellant's pain and suffering," which had "lasted several hours");

### B.     Crews's Eighth Amendment Claim Does Not Require Exhaustion.

Under the Prison Litigation Reform Act, inmates must exhaust the administrative remedies available to them at BOP. *See* 42 U.S.C. § 1997e(a). A key determination is whether an administrative remedy is available. "It follows that if an administrative remedy is not available, then an inmate cannot be required to exhaust it." *Tuckel v. Grover*, 660 F.3d 1249, 1252 (10th Cir. 2011). In order to be "available," a remedy must be "capable of use for the accomplishment of a purpose." *Id.*, quoting *Booth v. Churner*, 532 U.S. 731, 737 (2001). In the Tenth Circuit, district courts are "obligated . . . to ensure that any defects in exhaustion [are] not procured from the action or inaction of prison officials." *Id.*, quoting *Aguilar-Avellaveda v. Terrell*, 478 F.3f 1223, 1225 (10th Cir. 2007); *accord Turner v. Burnside*, 541 F.3d 1077, 1085 (11th Cir. 2008)

(commenting that when "an inmate foregoes administrative remedies because prison officials have made it irrational for him to pursue them, the inmate loses a benefit that Congress intended to bestow on him"). The Tenth Circuit has held that "we are confident that Congress did not intend the exhaustion requirement to summarily prevent inmates from vindicating their constitutional rights." *Tuckel*, 660 F.3d at 1253 (relying on *Brown v. Plata*, 563 U.S. 493, 526 (2011) ("Courts should presume that . . . Congress did not leave prisoners without a remedy for violations of their constitutional rights.")).

Here, because the involuntary discontinuation of his physician-prescribed, medically necessary treatment for his serious medical need of OUD will begin within a few days of his September 4, 2019, self-surrender date, BOP's administrative remedies are effectively unavailable to Crews. It would be too late by the time he exhausted to prevent the irreparable injury, pain, and suffering Crews will undergo in the meantime, leaving him without any remedy for that violation of his Eighth Amendment right. Furthermore, BOP's categorical written policy and Crews' counsel's communications with BOP counsel make it clear that "prison officials" have "prevent[ed]" Crews' efforts "to avail himself of [an] administrative remedy" in any event. *Tuckel*, 660 F.3d at 1252.

## II.   CREWS FACES IMMEDIATE IRREPARABLE INJURY.

Crews will suffer irreparable harm unless he receives his buprenorphine treatment while he is incarcerated. "When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Kikumura v. Hurley*, 242 F.3d 950, 963 (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948.1 (2d ed. 1995)), *abrogated on other grounds by* 916 F.3d 792 (10th Cir. 2019)); *see also Edmisten*, 287 F. App'x at 733–34 (acknowledging that *Kikimura* involved the

First Amendment but that its formulation of the "irreparable injury" rule could be applied to Eighth Amendment claims). Here, even presuming another of the formulations of irreparable harm applies—that the harm Crews will face "cannot be adequately atoned for in money," that it cannot be adequately "remed[ied] following a final determination on the merits," or that the harm is "both certain and great"—Crews meets that test. Absent temporary emergency relief, he will unnecessarily suffer (or is already suffering) pain (including nausea, vomiting, fever, sweating, and insomnia) as well as serious psychological symptoms, and will face a drastically increased risk of death.

Although these harms are avoidable, Defendants' policy will force Crews into acute withdrawal with painful physical and psychological symptoms. Because of his bipolar and generalized anxiety diagnoses, Crews will be at an especial risk of suicide and self-harm. Forced withdrawal will also increase Crews's risk of relapsing, overdosing, and dying. "Death is three times as likely for people out of treatment versus when in treatment," partly because the patient is no longer in remission and the patient's tolerance to narcotics is gone. Putting Crews at risk of these dire consequences is irreparable harm. *See Pesce*, 2018 WL 6171881, at *8 (finding irreparable harm where there was a "high risk of overdose and death upon [] release if not treated during [] incarceration."); *Smith*, 376 F. Supp. 3d at 161 ("Studies in the United States and abroad have observed that access to MAT during incarceration is associated with a decreased risk of post-release overdose death. Access to MAT is also correlated with a 75 percent decrease in all-cause mortality while the patient is incarcerated. On the other hand, forced withdrawal from MAT during incarceration has been linked to a significant decrease in post-release resumption of treatment, with lack of treatment in turn being associated with increased risk of overdose and death.")

III.     **THE BALANCE OF HARMS FAVORS GRANTING CREWS'S MOTION.**

The irreparable, and potentially permanent, harm suffered by Crews absent relief greatly outweighs any potential harm to Defendants. As discussed above, BOP already provides methadone for inmate pain management and for maintenance therapy of pregnant inmates. It is difficult to conceive of how providing the same class of medication to Crews would pose any burden on Defendants, especially given BOP's already existing systems for administering watch-take medications and the tried-and-tested methods for ensuring Suboxone (buprenorphine-naloxone) films cannot be diverted or trafficked in correctional settings. *See* Witt Decl. ¶ 17 Granting injunctive relief would therefore impose no measurable harm on Defendants aside from the cost of providing buprenorphine, which is extremely cost-effective. *Id.* ¶ 18. By contrast, the harm Crews would face absent his prescribed-buprenorphine treatment includes a high risk of overdose and death. The balance of harms therefore clearly favors granting Crews's motion.

IV.     **THE PUBLIC INTEREST STRONGLY FAVORS THE GRANT OF EMERGENCY INJUNCTIVE RELIEF.**

The public interest also favors Crews's requested injunctive relief. Defendants' policy of denying MAT, even to people with existing prescriptions, provides one more barrier to effective treatment for those suffering from OUD, enhancing rather than ameliorating the ongoing opioid crisis.  Indeed, Defendants' policies worsen that crisis by disrupting effective treatment and making relapse and potential overdose more likely. "[T]he public interest is better served by ensuring [Crews] receives the medically necessary treatment that will ensure he remains in active recovery." *See Pesce*, 2018 WL 6171881, at *8.

**CONCLUSION**

For the foregoing reasons, the Court should issue a Temporary Restraining Order and

Preliminary Injunction requiring Defendants to provide Suboxone (buprenorphine-naloxone)

films to Crews or until a full trial on the merits can be held.


Dated: September 6, 2019

Respectfully Submitted,

By:     _/s/ Lauren Bonds_____
Lauren Bonds, KS No. 27807
Zal Kotval Shroff, KS No. 28013
ACLU Foundation of Kansas
6701 W. 64th Street, Ste. 210
Overland Park, KS 66202
Phone: (913) 490-4100
Fax: (913) 490-4119
lbonds@aclukansas.org
zshroff@aclukansas.org

/s/ Anthony E. Rothert
Anthony E. Rothert*
Jessica Steffan
Gillian Wilcox*
ACLU of Missouri Foundation
906 Olive Street, Suite 1130
St. Louis, MO 63101
Tel: 314-669-3420
Fax: 314-652-3112
arothert@aclu-mo.org
jsteffan@aclu-mo.org
gwilcox@aclu-mo.org

*Application for Pro Hac Vice Forthcoming

ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system on this 6th day of September, 2019. On that date, I also served a copy of the foregoing document on the United State Attorney for the District of Kansas and Federal Bureau of Prisons.

<u>/s/ Zal K. Shroff</u>
Zal K. Shroff