UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| LEAMAN CREWS, | ) |
|             Plaintiff, | ) |
| v. | ) No.   19-cv-2541 |
| KATHLEEN HAWK SAWYER, in her official capacity as the Director of the Bureau of Prisons, and Dr. DEBORAH G. SCHULT, in her official capacity as Assistant Director for the Health Services Division of the Federal Bureau of Prisons, | ) |
|             Defendants. | ) |

**FIRST AMENDED COMPLAINT AND REQUEST FOR EMERGENCTY INJUNCTIVE RELIEF**

Plaintiff Leaman Crews, by and through his attorneys, brings this action against Defendant Kathleen Hawk Sawyer in her official capacity as the Director of the Bureau of Prisons, and Defendant Deborah G. Schult, in her official capacity as the Assistant Director for the Health Services Division for the Federal Bureau of Prisons, and alleges as follows:

**PRELIMINARY STATEMENT**

1.  This civil rights action challenges the life-threatening and discriminatory denial of necessary medical treatment in Bureau of Prison facilities overseen by Defendants Sawyer and Schult. Government officials are obligated to meet the medical needs of people in their custody. Yet, when it comes opioid use disorder, a deadly disease that afflicts millions of people across the United States, the Bureau's actions match neither its legal obligations nor the federal government's own admonishments to state and local prisons and jails.

2. The medical standard of care to treat opioid use disorder is "medication for addiction treatment" (also known as "medication-assisted treatment," or "MAT"), which utilizes FDA-approved medications like methadone or buprenorphine. In recent years, the U.S. Attorneys have investigated state prisons and local jails for denying MAT to inmates. But the Bureau itself does exactly that; defying medical consensus, it prohibits *all* of its inmates from accessing buprenorphine to treat their opioid use disorders. As applied to Plaintiff Leaman Crews, whose opioid use disorder is being successfully treated with buprenorphine, and who began a 36-month federal sentence on September 4, 2019, the Bureau's buprenorphine policy violates the Eighth Amendment to the U.S. Constitution, the Rehabilitation Act, and the Administrative Procedures Act ("APA"). It also places him in grave and immediate danger.

3. Plaintiff Leaman Crews has been diagnosed with opioid use disorder. Like many Americans, Crews first took opioids for debilitating pain after a serious car accident. Over time, he became utterly dependent on them. Mr. Crews unsuccessfully attempted to overcome addiction through detoxification. With the help of his doctor-prescribed buprenorphine treatment, Mr. Crews has escaped more than a decade of active addiction and entered long-term recovery. He has been clean for 15 months with the help of MAT. This is the only treatment that has worked for Mr. Crews.

4. Mr. Crews made a grave mistake using his position of employment to gain access to money he used to buy opioids. He has accepted responsibility for his actions, pled guilty, made substantial restitution payments, and worked through therapy to make amends to others in his life whom he harmed. Mr. Crew's mistake was serious but should not claim his life.

5. Bureau facilities do not provide buprenorphine-based maintenance treatment to any inmates with opioid use disorder. This policy applies even where, as here, a person is

already taking prescribed buprenorphine when they enter custody, and where the involuntarily discontinuation of that treatment would violate the standard of care.

6.  If Mr. Crews is denied his prescribed buprenorphine-based MAT while he is incarcerated, he will inevitably suffer and possibly die.  To begin, he will enter an acute and extremely painful period of withdrawal, which carries a heightened risk for numerous serious medical conditions.  He will also experience a heightened probability of relapsing into opioid use, both during his incarceration *and* upon his release, which can result in overdose and death.

7.  As applied to Mr. Crews, Defendants' buprenorphine policy violates his legal rights in three ways.

   a. First, it reflects deliberate indifference to his serious medical need, to his suffering, and to the long-term consequences of forced withdrawal.  Defendants' actions therefore violate Mr. Crews' Eighth Amendment right to be free from cruel and unusual punishment.

   b. Second, the denial of necessary medical care violates Mr. Crews' right, under the Rehabilitation Act, to be free from discrimination based upon his disability.

   c. Finally, the Bureau's refusal to provide Mr. Crews with access to medically-necessary treatment and its blanket denial of buprenorphine maintenance treatment also violate the APA because these final agency actions are arbitrary, capricious, and unlawful under the Rehabilitation Act.

8.  Mr. Crews seeks emergency, preliminary, and permanent relief to require Defendants to provide him with adequate medical care and prevent suffering.  Specifically, Mr. Crews seeks declaratory and injunctive relief requiring Defendants to provide his with access to

his medically necessary, physician-prescribed buprenorphine-based MAT throughout his incarceration at a Bureau facility.

## THE PARTIES

9. Plaintiff Leaman Crews resides in Leavenworth, Kansas.

10. Defendant Kathleen Hawk Sawyer is the Acting Director of the Federal Bureau of Prisons. She is being sued in her official capacity only, in which she is responsible for overseeing the operation all 122 Bureau facilities.

11. Defendant Dr. Deborah G. Schult is the Assistant Director of the Health Services Division for the Federal Bureau of Prisons. She is being sued in her official capacity only, in which she directs the Bureau's national medical program and oversees health care delivery for the Bureau.

## JURISDICTION AND VENUE

12. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. The requested relief is authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. This action seeks to vindicate rights guaranteed by the Eighth Amendment to the United States Constitution, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the Administrative Procedures Act, 5 U.S.C. §§ 704 and 706.

13. This Court has authority to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, 5 U.S.C. § 706, Rules 57 and 65 of the Federal Rules of Civil Procedure and the Court's inherent equitable powers.

14. Venue lies in the District of Kansas under 28 U.S.C. § 1391.

## FACTS

*Opioid Use Disorder Is a Life-Threatening Medical Condition and a Public Health Crisis.*

4

15. Opioids are a class of drugs that inhibit pain and can have euphoric side effects. Many opioids have legitimate medical uses, including chronic pain management. Others, such as heroin, are not generally used in medicine in the United States, but are sold on the black market.

16. Opioid use disorder is a chronic brain disease with potentially deadly complications. Signs of opioid use disorder include cravings, increased tolerance to opioids, the inability to cut back or control opioid use, withdrawal symptoms, and a loss of control.

17. Like other chronic diseases, opioid use disorder often involves cycles of relapse and remission.

18. Without treatment or other recovery, patients with opioid use disorder are frequently unable to control their use of opioids. Opioid use disorder is progressive and can result in disability or premature death, including due to accidental overdose.

19. Opioid use disorder is a national public health crisis. As of 2016, 2.1 million Americans suffered from this disease. Between 1999 and 2017, more than 700,000 people died from opioid overdose. The death toll has increased exponentially in the past five years, and the number of opioid overdose deaths in 2017 was six times higher than in 1999. Every day in America, an average of 130 people die after overdosing on opioids—equivalent to one person every 12.5 minutes.

20. Opioid use disorder is especially dangerous for people who are or have been incarcerated.

21. As the 2017 Final Report from the President's Commission on Combating Drug Addiction and the Opioid Crisis 2017 explained, "[i]n the weeks following release from jail or prison, individuals with or in recovery from OUD are at elevated risk of overdose and associated fatality." A recent study by the Massachusetts Department of Public Health similarly found that

"[t]he opioid overdose death rate is 120 times higher for those recently released from incarceration compared to the rest of the adult population." The same study found that "[o]pioid-related deaths among persons recently released from incarceration [in Massachusetts] have increased 12-fold between 2011 and 2015," and, "[i]n 2015, nearly 50% of all deaths among those released from incarceration were opioid-related."

*Medication for Addiction Treatment Is the Standard of Care for Opioid Use Disorder.*

22. MAT is the standard of care for opioid use disorder.

23. MAT "is a comprehensive approach that combines FDA-approved medications . . . with counseling and other behavioral therapies to treat patients with opioid use disorder (OUD)." Three medications used in MAT are methadone (sold under brand names such as Dolophine and Methadose), buprenorphine (sold under brand names such as Subutex, Suboxone, and Bunavail), and naltrexone (sold under brand names such as ReVia and Vivitrol). These medications have been approved by the United States Food and Drug Administration for treatment of opioid addiction.

24. Naltrexone works by blocking opioids from producing their euphoric effects and thus reducing a desire for opioids over time. Buprenorphine and methadone act through a different mechanism than naltrexone: both activate rather than block opioid receptors to relieve withdrawal symptoms and control cravings.

25. Because of this important ability to act on opioid receptors without presenting the same risk of overdose, buprenorphine and methadone have both been deemed "essential medicines" according to the World Health Organization. Both methadone and buprenorphine facilitate extinction learning (a gradual decrease in response to a stimulus, such as an opioid),

because patients learn that they will not get the same "high" from taking illicit drugs like heroin and fentanyl.

26. As with any prescription medication, patients' responses to these medications are individualized—a patient may find that only one of these medications provides effective treatment without significant adverse side effects.

27. The results of treatment with MAT are dramatically superior to other treatment options.

28. Studies of MAT show improved retention in treatment, abstinence from illicit drugs, and decreased mortality. MAT has been shown to decrease opioid use, opioid-related overdose deaths, criminal activity, and infectious disease transmission. MAT has also been shown to increase patients' social functioning and retention in treatment.

29. The primary driver of treatment efficacy in MAT regimens is the medication.

30. Studies have shown that maintenance medication treatments of opioid use disorder reduce all cause and overdose mortality and have a more robust effect on treatment efficacy than behavioral components of MAT. Buprenorphine and methadone have been clinically proven to reduce opioid use more than (1) no treatment, (2) outpatient treatment without medication, (3) outpatient treatment with placebo medication, and (4) detoxification only. One study documented the treatment outcomes from a detoxification facility and showed (1) a twenty-nine percent chance of relapse on the day of discharge, (2) a sixty percent chance relapse after one month, and (3) a success rate of only five to ten percent after one year.

31. Once a patient is successfully recovering from opioid use disorder through MAT, the arbitrary and sudden cessation of the medication violates the standard of care and, in the case

of methadone and buprenorphine, will cause excruciating withdrawal symptoms within 48 hours of cessation.

32. Withdrawal symptoms include severe dysphoria, cravings for opiates, irritability, sweating, nausea, tremor, vomiting, insomnia, and muscle pain. These symptoms can sometimes lead to life-threatening complications.

33. Withdrawal is particularly dangerous for patients with pre-existing psychiatric conditions, such as bipolar disorder, because withdrawal symptoms can exacerbate their psychiatric illness.

### *The Federal Government Has Widely Adopted the Medical and Scientific Consensus that Medication for Addiction Treatment Is the Standard of Care for Opioid Use Disorder.*

34. Embracing the medical and scientific consensus, numerous federal entities have expressly endorsed the necessity of MAT, including: the Department of Health and Human Services ("HHS"), the Food and Drug Administration ("FDA"), the National Institute on Drug Abuse ("NIDA"), the President's Commission on Combating Drug Addiction and the Opioid Crisis, the Office of National Drug Control Policy ("ONDCP"), and the Substance Abuse and Mental Health Services Administration ("SAMHSA").

35. For example, emphasizing that "the gold standard for demonstrating efficiency in clinical medicine" has shown that MAT is more effective in reducing illicit opioid use than no medication, SAMHSA has concluded that "just as it is inadvisable to deny people with diabetes the medication they need to help manage their illness, it is also not sound medical practice to deny people with OUD access to FDA-approved medications for their illness." SAMHSA has also highlighted that "dosing and schedules of pharmacotherapy must be individualized," and that some individuals may require "lifelong treatment."

36. The Department of Justice has confirmed that MAT is the standard of care for treatment of opioid use disorder.

37. The Department of Justice has taken the position that denying non-incarcerated individuals suffering from opioid use disorder access to MAT can constitute unlawful disability discrimination under the Americans with Disabilities Act ("ADA").

38. The Department of Justice has also taken the position that denying incarcerated individuals suffering from opioid use disorder access to MAT can constitute unlawful disability discrimination under the ADA.

39. The Department of Justice and its subordinates have taken concrete actions to combat this discrimination. In 2017, the Department of Justice's Civil Rights Division launched the Opioid Initiative to enforce the ADA and work with U.S. Attorney's Offices nationwide "to ensure that people who have completed, or are participating in, treatment for OUD do not face unnecessary and discriminatory barriers to recovery."

40. Also in 2017, the U.S. Attorney for the Southern District of New York sent a 10-page letter to the New York State Attorney General, explaining "it has come to our attention that the Family Court and the Surrogate's Court in Sullivan County, New York, as well as the stake holders involved with those courts, may benefit from further information about the ADA's application to individuals receiving medication-assisted treatment ("MAT") such as treatment with methadone or buprenorphine, for substance use disorders." Emphasizing that "MAT is a safe and widely accepted strategy for treating opioid disorders," with "broad support [] among medical and substance use experts," the letter instructed that "the Sullivan family court and Sullivan surrogate's court should ensure that their policies and practices with respect to individuals participating in MAT . . . are consistent with ADA requirements."

41.     In March 2018, the U.S. Attorney for Massachusetts initiated an ADA investigation of the Massachusetts Department of Correction for its failure to provide non-pregnant inmates who had been prescribed MAT to treat their opioid use disorder with continued access to MAT during their incarceration.  In so doing, the office emphasized "that all individuals in treatment for OUD, regardless of whether they are inmates or detainees, are already protected by the ADA, and [] the DOC has existing obligations to accommodate this disability."

42.     In October 2018, the U.S. Attorney for Massachusetts initiated an ADA investigation of several county sheriffs for their failure to provide inmates who had been prescribed methadone or buprenorphine to treat their opioid use disorder with continued access to these medications during their incarceration.

***Providing Medication For Addiction Treatment Is Particularly Important, and Administrable, in Correctional Settings.***

43.     Withholding MAT from incarcerated people with opioid use disorder causes some of them to die.

44.     As the President's Commission on Combating Drug Addiction and the Opioid Crisis has explained, "MAT has been found to be correlated with reduced risk of mortality in the weeks following release [from incarceration]," and a "large study of individuals with [opioid use disorder] released from prison found that individuals receiving MAT were 75% less likely to die of any cause and 85% less likely to die of drug poisoning in the first month after release."

45.     Providing MAT in correctional settings is administrable.

46.     Providing MAT in correctional settings also saves lives.

47.     Numerous authorities have therefore recommended providing MAT in jails and prisons to help address the serious risks the opioid crisis poses for incarcerated people.

48. For example, the Department of Justice's Adult Drug Court Discretionary Grant Program requires grantees to permit the use of MAT.

49. On behalf of the Trump Administration, the ONDCP's 2019 report establishes "increasing the availability of MAT for incarcerated individuals" as a priority initiative.

50. SAMSHA identifies "making treatment available to criminal justice populations" as one of the "remaining challenges" in fighting the opioid public health crisis.

51. In a 2018 report, the National Sheriffs' Association and the National Commission on Correctional Health Care explain that "correctional withdrawal alone actually increases the chances the person will overdose following community release due to loss of opioid tolerance" and "[f]or this reason, all individuals with OUD should be considered for MAT" while they are incarcerated. They emphasize that providing MAT in jails and prisons can "contribut[e] to the maintenance of a safe and secure facility for inmates and staff" and reduce recidivism, withdrawal symptoms, the risk of post-release overdose and death, and disciplinary problems.

52. The American Society of Addiction Medicine, the leading professional society in the country on addiction medicine, also recommends treatment with MAT for people with opioid use disorder in the criminal justice system.

53. As recognized by these authorities, opioid use disorder is a chronic relapsing condition that requires medically appropriate treatment just like other chronic diseases.

54. Once patients successfully begin using one form of MAT, they need to be maintained on that treatment under medical supervision to give them the best chance of success.

55. Forced withdrawal is not medically appropriate for patients receiving MAT.

56. Forced withdrawal disrupts their treatment plan, leading to a seven-fold decrease in continuing MAT after release. As the National Sheriffs' Association and National

Commission on Correctional Healthcare emphasize, "forced detoxification of prescribed opioid medication, such as methadone, can undermine an individual's willingness to engage in MAT in the future, compromising the likelihood of long-term recovery."  Death is three times as likely for people out of treatment versus when in treatment.

57. Reflecting this knowledge, numerous jails and prisons follow the medical standard of practice and allow prisoners to continue with MAT during incarceration.  Examples include Bernalillo County Metropolitan Detention Center (New Mexico); Rikers Island Correctional Facility (New York); Kings County Jail (Washington State); Orange County Jail (Florida).  The Rhode Island and Vermont Departments of Correction make MAT available to all of their prisoners, even those who were not receiving MAT before being incarcerated.

58. Following the medical standard of practice yields positive results.  After the first year of the program within the Rhode Island Department of Corrections, 95% of inmates who were on MAT at the time they were incarcerated continued with their treatment after their release.  "Research showed that this program reduced post-release deaths by 60% and all opioid-related deaths in the state by more than 12%."

***The Federal Bureau of Prisons Categorically and Arbitrarily Denies Medication for Addiction Treatment for Inmates with Opioid Use Disorder.***

59. The Bureau's National Formulary and Pharmacy Services Program Statement establish the Bureau's official prescribing policies.

60. The Bureau's Formulary instructs that "ALL BOP institutions, including Medical Centers, are expected to abide by the [F]ormulary as outlined in the BOP Pharmacy Services Program Statement."  It further mandates that all clinical directors, health services administrators, associate wardens and wardens are "expected to support and ensure compliance with the BOP National Formulary."

61. Under these mandatory policies, the Bureau denies buprenorphine to all inmates suffering from opioid use disorder for "maintenance therapy" and methadone treatment to non-pregnant inmates.

62. The Bureau's denial of buprenorphine is arbitrary.

63. The Bureau's denial of buprenorphine to all inmates with opioid use disorder is also categorical; it applies even if buprenorphine has been prescribed by a physician as a medically-necessary treatment for someone placed into the Bureau's custody.

64. The Bureau's Program Statement for Pharmacy Services restricts the dissemination of buprenorphine treatment of inmates suffering from opioid use disorder, providing that this medication "will only be approved for detoxification, NOT for pain or maintenance therapy."

65. There are no exceptions to this blanket prohibition.

66. The Bureau's Clinical Guidance on Detoxification of Chemically Dependent Inmates instructs Bureau facilities to taper inmates off of buprenorphine over three to ten days.

67. The Bureau's National Formulary similarly prohibits the use of methadone to treat opioid use disorder, explaining the uses are limited to "treatment of opiate addicted pregnant inmates; detoxification of opiate addicted inmates; and treatment of severe pain."

68. Some Bureau facilities have begun to offer Vivitrol, but, on information and belief, they only do so immediately prior to an individual's transfer out of the Bureau facility.

69. Inmates in a Bureau facility depend upon the facility to provide them with all medical care.

70. Bureau facilities provide medically-necessary care to other inmates in their custody, but not to inmates who suffer from opioid use disorder.

71. For example, buprenorphine is provided to inmates for detoxification, but uniformly denied to inmates to treat their opioid use disorder.

*Without Judicial Intervention, Mr. Crews Will Be Denied Medically-Necessary Treatment for His Opioid Use Disorder When He Is Incarcerated in a Federal Bureau of Prisons Facility.*

72. Defendants' policies, if permitted to be applied to Mr. Crews, will cause him to lose access to buprenorphine while he is incarcerated and experience what is known as "withdrawal."

73. Mr. Crews' buprenorphine treatment is medically necessary. For him, forced withdrawal would be dangerous and potentially life-threatening.

74. Mr. Crews is diagnosed with opioid use disorder, a serious medical need and a recognized disability. If untreated, Mr. Crews' opioid use disorder is likely to result in relapse and potentially a fatal opioid overdose, among other things.

75. Mr. Crews has suffered from addiction for years. Before he was prescribed the proper dose of buprenorphine, Mr. Crews unsuccessfully attempted to cure his addiction by discontinuing opioids.

76. MAT with buprenorphine has been the only treatment that has enabled Mr. Crews to remain in active recovery and to get his life back.

77. For over a year, Mr. Crews has been prescribed buprenorphine for treatment of his opioid use disorder. With the help of the proper dose of buprenorphine, he has been in active recovery and has not relapsed. Buprenorphine is medically necessary for the treatment of Mr. Crews' serious medical condition.

78. Without access to this medically-necessary treatment, Mr. Crews faces a high risk of relapse, overdose and death.

79. Mr. Crews is currently incarcerated at the Bureau's Leavenworth facility and is set to serve a 36-month sentence.

80. If, as the Bureau's policies mandate, Mr. Crews is prevented from accessing his buprenorphine treatment when he is incarcerated, he will begin experiencing withdrawal symptoms within 48 hours. These excruciating symptoms will continue for several weeks. Reducing Mr. Crews' dose over three to ten days will similarly trigger withdrawal symptoms within a matter of days, as that rate is far too fast and much more accelerated than the standard protocol.

81. On August 27, 2019, Mr. Crews' counsel sent a letter to the Leavenworth Warden informing them of his serious medical need and requesting assurance that Mr. Crews would be provided with his physician-prescribed dose of buprenorphine during his time in their custody. Counsel also called and left voicemail messages on multiple occasions. No response has been received.

82. On September 4 and September 5, 2019, Mr. Crews' counsel spoke with Bureau counsel. On September 5, Bureau counsel stated that Mr. Crews would be given an individualized assessment of his general medical needs and would be given treatment of some kind. But Bureau counsel would not confirm that, in assessing Mr. Crews, Defendants could or would deviate from their blanket prohibition of buprenorphine treatment. Indeed, Bureau counsel confirmed that Suboxone (buprenorphine-naloxone) is unavailable.

83. Accordingly, the relevant officials at the Bureau have been informed of Mr. Crews' diagnosis and need for medical treatment, but it appears that they will not provide such treatment while he is incarcerated in Leavenworth. In fact, no one on behalf of the Bureau has

asserted that, absent a court order, they will even consider continuing Mr. Crews' buprenorphine treatment.

## CAUSES OF ACTION

### COUNT I – THE EIGHTH AMENDMENT
**(Deliberate Indifference to Serious Medical Need in Violation of the Eighth Amendment)**

84. The foregoing allegations are re-alleged and incorporated herein.

85. The Defendants, while acting under color of federal law, deliberately, purposefully, and knowingly deny or will deny Mr. Crews access to necessary medical treatment for his opioid use disorder, which is a serious medical need.

86. Denying Mr. Crews access to his prescribed dosage of buprenorphine will immediately cause him physical and psychological suffering, will expose him to heightened risk for other serious medical conditions, and could trigger relapse into active addiction, potentially resulting in overdose and death.

87. As applied to Mr. Crews, the denial of treatment by Defendants amounts to deliberate indifference to a serious medical need, in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.

### COUNT II – REHABILITATION ACT
**(Unlawful Discrimination Against Qualified Individuals with Disabilities)**

88. The foregoing allegations are re-alleged and incorporated herein.

89. The Bureau of Prisons, which is overseen by Defendants, receives federal funding and is a federal agency that is subject to the Rehabilitation Act. 29 U.S.C. § 794(a).

90. Drug addiction is a "disability" under the Rehabilitation Act. 29 U.S.C. § 705(20)(B); 42 U.S.C. §§ 12102 and 12131(2); 28 C.F.R. § 35.108 (the phrase "physical or mental impairment includes, but is not limited to . . . drug addiction, and alcoholism").

91. The Rehabilitation Act applies to people, like Mr. Crews, who are participating in a supervised drug rehabilitation program.

92. Defendants deny Mr. Crews the benefits of the Federal Bureau of Prisons' medical programs on the basis of his disability.

93. Defendants refuse to make a reasonable accommodation for Mr. Crews by providing her with access to his prescribed dosage of buprenorphine during his incarceration, thereby discriminating against him on the basis of disability, even though accommodation would in no way alter the nature of the healthcare program.  On information and belief, Defendants do not deny medically-necessary, physician-prescribed medications to other inmates with serious, chronic medical conditions, such as diabetes.

### COUNT III – ADMINISTRATIVE PROCEDURES ACT
### (Agency Action that is Arbitrary, Capricious and Not in Accordance with the Law)

94. The foregoing allegations are re-alleged and incorporated herein.

95. The Federal Bureau of Prisons, which is overseen by Defendants, is a federal agency whose final actions are subject to judicial review under the Administrative Procedures Act.  5 U.S.C. §§ 701, 704.

96. Under the Administrative Procedures Act, a reviewing court shall "hold unlawful and set aside agency actions, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).

97. The Federal Bureau of Prisons Pharmacy Services Program Statement No. 6360.01 and 2018 National Formulary Parts 1 and 2 are the subject of the Bureau's completed decision-making process. These documents directly affect the parties, as they bind the Defendants to prevent all inmates, including Mr. Crews, from continuing their medically-necessary buprenorphine maintenance treatment.  The Federal Bureau of Prisons Pharmacy

Services Program Statement No. 6360.01 and 2018 National Formulary Parts 1 and 2 therefore constitute final agency action.

98. This final agency action automatically denies reasonable accommodation to any inmates suffering from opioid use disorder with a medically-necessary buprenorphine prescription, including Mr. Crews. For the reasons described in Count II, this final agency action is arbitrary, capricious, and unlawful under the Rehabilitation Act and therefore violates the Administrative Procedures Act. 5 U.S.C. §§ 704, 706

99. Defendants deny Mr. Crews access to his medically-necessary buprenorphine treatment. This final agency action is arbitrary, capricious, and unlawful under the Rehabilitation Act for the reasons described in Count II, and therefore violates the Administrative Procedures Act. 5 U.S.C. §§ 704, 706.

**PRAYER FOR RELIEF**

Wherefore, Mr. Crews asks this Court to GRANT the following relief:

(a) Emergency, preliminary, and permanent injunctive relief ordering Defendants to provide Mr. Crews with access to MAT, including the buprenorphine dosage prescribed by his physician, during his entire term of incarceration;

(b) A declaratory judgment holding that Defendants' policy denying all inmates access to buprenorphine treatment for opioid use disorder, as applied to Mr. Crews, violates the Eighth Amendment;

(c) A declaratory judgment holding that Defendants' policy denying all inmates access to buprenorphine treatment for opioid use disorder, as applied to Mr. Crews, violates the Rehabilitation Act and the APA;

(d) Award Mr. Crews his attorneys' fees and costs;

(e) Any further relief this Court deems just and proper.

<u>Designation of Place of Trial</u>

Pursuant to D. Kan. 40.2, Plaintiff designates Kansas City, Kansas as the place of trial.

Dated: September 7, 2019

                                                    Respectfully Submitted,

By:    /s/ Lauren Bonds
          Lauren Bonds, KS No. 27807
          Zal Kotval Shroff, KS No. 28013
          ACLU Foundation of Kansas
          6701 W. 64th Street, Ste. 210
          Overland Park, KS 66202
          Phone: (913) 490-4100
          Fax: (913) 490-4119
          lbonds@aclukansas.org
          zshroff@aclukansas.org

          /s/ Anthony E. Rothert
          Anthony E. Rothert*
          Jessica Steffan*
          Gillian Wilcox*
          ACLU of Missouri Foundation
          906 Olive Street, Suite 1130
          St. Louis, MO 63101
          Tel: 314-669-3420
          Fax: 314-652-3112
          arothert@aclu-mo.org
          jsteffan@aclu-mo.org
          gwilcox@aclu-mo.org

          *Application for Pro Hac Vice Forthcoming

          ATTORNEYS FOR PLAINTIFFS

CERTIFICATE OF SERVICE

I hereby certify that on September 7, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. On that date, I also served a copy of the Amended on the United State Attorney for the District of Kansas and Federal Bureau of Prisons.

Dated: September 7, 2019

/s/ Lauren Bonds
Lauren Bonds